UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE TECHNOLOGY OPPORTUNITY
GROUP, LTD.,

                           Plaintiff,

        v.

BCN TELECOM, INC., *et al.*,

                           Defendants.

No. 16-CV-9576 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Jonathan Scott Bodner, Esq.
Bodner Law Firm LLC
Great Neck, NY
*Counsel for Plaintiff*

Stephen Jeffrey Riegel, Esq.
Weitz and Luxenburg, P.C.
New York, NY
*Counsel for Plaintiff*

Paul Thomas Gentile, Esq.
Paul T. Gentile, P.C.
New York, NY
*Counsel for Plaintiff*

Brendan Judge, Esq.
Aaron Henry Gould, Esq.
Connell Foley LLP
Newark, NJ
*Counsel for Defendants Georges Group, the Estate of Richard M. Boudria, and Kathleen Burns*

Jeffrey L. Nagel, Esq.
Gibbons P.C.
New York, NY
*Counsel for Defendant BCN Telecom, Inc.*

KENNETH M. KARAS, District Judge:

The Technology Opportunity Group, Ltd. ("Plaintiff") filed the instant Action against BCN Telecom, Inc. ("BCN"), The Georges Group of New Jersey, Inc. ("GG"), the Estate of Richard M. Boudria ("Boudria"), and Kathleen Burns, a/k/a Kathleen Boudria ("Burns") (collectively, "Defendants"), alleging violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, as well as state law claims for fraudulent misrepresentation, unjust enrichment, breach of contract, and quantum meruit. (*See generally* Second Am. Compl. ("SAC") (Dkt. No. 61).)

Before the Court is Defendants' Joint Motion To Dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Defs.' Not. of Mot. (Dkt. No. 86.) For the following reasons, the Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint, and are taken as true for purposes of deciding this Motion.

#### 1. The Master Agent Agreement

BCN is a telecommunications company that provides voice, data, wireless, and cloud services, primarily for businesses. (SAC ¶ 12.) Boudria is BCN's Chief Executive Officer ("CEO") and Chairman of the Board, and Burns is his wife. (*Id.* ¶¶ 7–8.) BCN offers its products and services through a network of agents and subagents. (*Id.* ¶ 13.)

In December 2002, BCN and Plaintiff entered into an agreement which provided that Plaintiff would serve as a "Master Agent" for BCN (the "Master Agent Agreement"). (*Id.* ¶ 20.) As Master Agent, TOG would "process[] and provision[]" client orders, provide customer service and support, perform "pre-billing functions," and prepare and process agent commission

payments. (*Id.* ¶ 23.) "Contemporaneously with execution of" the Master Agent Agreement, Boudria and Thomas J. McCrosson ("McCrosson"), CEO and President of Plaintiff, (*id.* ¶ 4), orally agreed to various additional conditions, including: that all customer accounts procured by Plaintiff would be overseen and maintained by it; that Plaintiff would be consulted regarding significant decisions relevant to its customers; that the Master Agent Agreement was terminable at will by either party and that Plaintiff could migrate its customers to a new carrier upon termination, with BCN's cooperation; that Plaintiff would receive all amounts due through a migration; and that neither party would terminate the Agreement in a manner that harmed the other's business or its customers, (*id.* ¶ 28). A later modification, made in or before 2007 by oral agreement between Boudria and McCrosson, provided that Plaintiff would be compensated pursuant to the following formula (the "Master Agent Formula"): gross monthly revenue billed by BCN for Plaintiff's customers, less the cost of goods sold ("COGS"), less Plaintiff's subagents' commissions in the amount of 10% of gross billed revenue, less a monthly fee to BCN's billing company, with the remaining funds (the "Margin") split evenly between BCN and Plaintiff. (*Id.* ¶ 31.) BCN paid Plaintiff monthly commissions for its work, and Plaintiff, in turn, made monthly commission payments to its subagents. (*Id.* ¶¶ 24, 29, 33.) Boudria and McCrosson also orally agreed that Plaintiff "would receive advances on a weekly basis, subject to 'true-ups' on at least a quarterly basis, for any amount overpaid or underpaid to [Plaintiff]" under the Master Agent Formula. (*Id.* ¶ 35.)

At some point, Defendant GG, a New Jersey corporation of which Burns was the sole director, (*id.* ¶ 52), entered into a subagent agreement with Plaintiff, and quickly became one of Plaintiff's most successful subagents, (*id.* ¶ 55). In 2006, Plaintiff paid GG $406,543 in commissions, and by 2009 that number rose to $507,750. (*Id.*) Beginning in 2005, Boudria

"demanded that McCrosson . . . make additional periodic payments to him personally in cash." (*Id.* ¶ 58.)  McCrosson complied, and made cash payments to Boudria every month at one-on-one meetings in New Jersey.  (*Id.*)

In 2004, GG retained its largest customer account, Litton Loan Services ("Litton").  (*Id.* ¶ 56.)  Litton typically accounted for over 50% of GG's customer-generated revenue.  (*Id.*)  However, by 2010, GG "was in the process of losing the Litton account to another service provider"; as a result, revenues from the Litton account declined from $1,685,178.13 in 2009, to $971,660.54 in 2010, and ultimately to $0 in 2011.  (*Id.* ¶ 60.)  On September 28, 2010, Boudria assured McCrosson that GG "would be getting another customer account large enough to replace the lost revenue from the Litton account," but that in the meantime Plaintiff should continue making commission payments to GG "as if GG still held the Litton account."  (*Id.* ¶ 61.)  McCrosson complied, and "continued to make commission payments by wire transfer to GG's bank account as if GG still had the Litton account and its revenues," as well as the cash payments directly to Boudria each month.  (*Id.* ¶¶ 62, 64.)  In June 2011, McCrosson "complained that the revenues from the replacement accounts that GG had obtained generated far lower revenue than that of the lost Litton account"; Boudria "reassured him that the revenues from the replacement accounts . . . would be sufficient to replace the lost revenues of the Litton account."  (*Id.* ¶ 66.)

On January 5, 2012, at a lunch meeting in New Jersey, McCrosson told Boudria that Plaintiff would stop making commission payments to GG and cash payments to Boudria based on the former revenues received from the Litton account, "and would only make its commission payments to GG based on its customers' actual usage and revenues."  (*Id.* ¶ 67.)  In response, "Boudria demanded and directed that Plaintiff continue making" the commission and cash

payments, and "threatened that if Plaintiff stopped making" the payments, "Boudria would interfere with the payment to [Plaintiff] of amounts BCN legitimately owed to [Plaintiff] under the Master Agent Agreement." (*Id.* ¶¶ 73–74.) Plaintiff "considered Boudria's demands to be a continuing threat to [Plaintiff]'s business arrangement with Defendant BCN, . . . and to [Plaintiff]'s financial solvency which was increasingly intertwined with and dependent on BCN." (*Id.* ¶ 75.) Plaintiff also feared that it would be "impossible for Plaintiff to extricate itself from its agreements and arrangements with BCN and Boudria" because migrating Plaintiff's customers would require BCN's cooperation. (*Id.* ¶¶ 76–78.) "[F]earing the loss of substantial sums for the services [Plaintiff] had provided," McCrosson complied with Boudria's directives. (*Id.* ¶ 79.) Plaintiff alleges that "[u]pon information and belief, . . . Burns allowed Boudria access to . . . those portions of the payments . . . which were in excess of the payments to which GG was entitled." (*Id.* ¶ 85.)

On March 4, 2013, McCrosson told Boudria that Plaintiff could not afford to continue making the commission and cash payments that Boudria demanded. (*Id.* ¶ 91.) "In response, Boudria replied with words to the effect that because McCrosson's sons 'are in the business, you wouldn't want to do something that would affect their futures,'" which McCrosson understood to be a threat. (*Id.* ¶¶ 92–93.) McCrosson therefore continued making the payments. (*Id.* ¶ 95.)

In mid-August 2013, at BCN's New Jersey offices, Boudria accused McCrosson of failing to keep up with the demanded commission and cash payments. (*Id.* ¶ 98.) At this time, an entity called G. Marshall Communications, Inc. ("G. Marshall"), which Plaintiff had referred to BCN as an agent "and assisted in managing the customer base in exchange for a monthly fee paid by BCN to [Plaintiff] . . . , was coming up for renewal or extension of its contract with BCN." (*Id.* ¶ 99.) When McCrosson told Boudria that he was having difficulty keeping up with

his payments, Boudria "responded with words to the effect that he doesn't sign 'contracts' unless 'I am personally making money,'" which McCrosson understood to be a threat not to renew G. Marshall's contract, as well as "a continuing threat to [Plaintiff's] profitable business arrangement with Defendant BCN." (*Id.* ¶¶ 98, 100–01.) McCrosson therefore continued making the payments, and Boudria ultimately renewed G. Marshall's contract. (*Id.* ¶ 103.)

From mid-August 2013 through September 2013, "McCrosson repeatedly told Boudria that he was not financially able to continue" to make the demanded commission and cash payments, which by this time amounted to $36,000 per month. (*Id.* ¶ 104.) At Boudria's office on October 3, 2013, Boudria handed McCrosson a piece of paper, on which he'd written that the commission payments would be reduced to $30,000, but the cash payments increased to $5,000. (*Id.* ¶ 105.) "McCrosson understood Boudria's comment that he would 'have no reason not to keep up' with his payments to mean that unless he continued to make these new amounts of payments . . . that Boudria, through his control of BCN, would cause BCN not to pay or to delay payments to [Plaintiff] of amounts BCN legitimately owed" under their various written and oral agreements. (*Id.* ¶ 106.) Fearing financial loss, McCrosson agreed to continue making the payments requested. (*Id.* ¶¶ 108–12.)

In February 2016, shortly after McCrosson made a cash payment to Boudria, "Boudria . . . took out some yellow post-it notes and chastised McCrosson for failing to make some of the [monthly payments] Boudria had demanded, and that McCrosson was behind about $50,000 to $75,000" in payments. (*Id.* ¶ 122.) McCrosson responded that "money was tight" and that BCN owed Plaintiff "substantial amounts of money" for services performed. (*Id.* ¶ 123.) On April 8, 2016, after another cash payment, McCrosson told Boudria that BCN owed Plaintiff over $500,000, and that he would not make any further payments until the money was received. (*Id.*

¶ 124.)  In total, Plaintiff made $1,567,800 in wire transfers to GG, and paid Boudria approximately $192,000 in cash.  (*Id.* ¶¶ 125–26.)

### 2. Additional Agreements

#### a.  The OMG Agreement

In 2007, BCN and Plaintiff entered into an oral agreement for Plaintiff "to assist[,] build, maintain, service[,] and oversee customer use of BCN services on a separate billing partition known as the 'OMG Partition,'" in exchange for monthly payments (the "OMG Agreement"). (*Id.* ¶ 127.)  The Parties orally agreed that the OMG Agreement would remain in effect as long as the Master Agent Agreement remained in place, along with several other contractual terms.  (*Id.* ¶ 129.)  Both parties performed under the contract from 2007 to late 2016.  (*Id.* ¶¶ 130–31.)

#### b.  The Telecorp. Agreement

In 2003, BCN and Plaintiff entered into an oral agreement for Plaintiff "to assist[,] build, maintain, service, manage, and oversee customer use of BCN services on a separate billing partition known as the 'Telecorp. Partition,'" in exchange for monthly payments (the "Telecorp. Agreement").  (*Id.* ¶ 137.)  The parties agreed that the Telecorp. Agreement would remain in effect as long as the Master Agent Agreement remained in place, and orally modified its terms from time to time.  (*Id.* ¶¶ 138, 140.)  Both parties performed under the contract from 2003 to late 2015.  (*Id.* ¶¶ 143–46.)

#### c.  The G. Marshall Agreement

In 2002, BCN and Plaintiff entered into an oral agreement for Plaintiff "to assist G. Marshall [to] manage its customer base at BCN," in exchange for monthly payments (the "G. Marshall Agreement").  (*Id.* ¶ 147.)  The Parties orally agreed to various terms, including that the G. Marshall Agreement would remain in effect as long as the Master Agent Agreement remained

in place, and orally modified those terms from time to time. (*Id.* ¶ 148–49.) Both parties performed under the contract from 2002 to late 2015. (*Id.* ¶¶ 150–54.)

### d. The Barter Account Agreement

In 2007, BCN and Plaintiff entered into an oral agreement for Plaintiff to provide "certain telecommunications services to BCN or BCN's customers," in exchange for provision by BCN of "certain telecommunications services of comparable value" (the "Barter Account Agreement"). (*Id.* ¶ 155.) Both parties performed under the contract, and attempted to reconcile costs of the services performed from December 2015 through at least December 2017. (*Id.* ¶¶ 158–66.)

### 3. Termination of the Agreements

In October 2014, "BCN began taking harmful action against [Plaintiff] in efforts to effect a global termination of its business relationship with [Plaintiff] . . . but to retain [Plaintiff]'s customers . . . ." (*Id.* ¶ 168.) Specifically, from October 2014, BCN failed to pay "substantial amounts owed" under the various written and oral agreements, despite Plaintiff's continued performance, and "failed to provide certain or accurate true-up reports to allow [Plaintiff] to reconcile estimated payments made." (*Id.* ¶¶ 169–70.) BCN also "interfered with [Plaintiff]'s efforts to collect its customers' accounts receivable for BCN and sent inaccurate collection notices to [Plaintiff]'s customers." (*Id.* ¶ 172.) Nevertheless, Plaintiff continued to perform under the agreements "until a migration of [Plaintiff]'s customers to [Plaintiff]'s new carrier . . . was effected in March 2017." (*Id.* ¶ 175.)

### 4. Causes of Action

Plaintiff's first three causes of action are RICO claims. Plaintiff asserts one claim under 18 U.S.C. § 1962(c) against Boudria, (*id.* ¶¶ 198–205), another claim under 18 U.S.C. § 1962(c)

against both Boudria and BCN, (*id.* ¶¶ 218–33), and a claim under 18 U.S.C. § 1962(d) against GG, Burns, and various unnamed John and Jane Doe Defendants, (*id.* ¶¶ 206–217). Plaintiff also asserts a fraudulent misrepresentation claim against Boudria, (*id.* ¶¶ 234–40), and an unjust enrichment claim against Boudria, Burns, and GG, (*id.* ¶¶ 241–47). Plaintiff asserts breach of contract, unjust enrichment, and quantum meruit claims against BCN for breach of the Master Agent Agreement, as well as the various oral agreements alleged. (*Id.* ¶¶ 248–359.) Plaintiff seeks treble damages "believed to be [in] excess of $1 million" for the RICO claims, and compensatory damages for the various common law claims. (*See id.* at 64–67.)

D.  Procedural Background

Plaintiff filed the initial Complaint on December 13, 2016. (Compl. (Dkt. No. 8).) On December 20, 2016, the Court ordered Plaintiff to file a RICO Case Statement. (Dkt. No. 22.) Plaintiff asked the Court to reconsider this Order. (Dkt. No. 24.) The Court denied the request, requiring Plaintiff to file a RICO Case Statement. (Dkt. No. 25.) Plaintiff filed a RICO statement on January 10, 2017. (Dkt. No. 36.) On January 23, 2017, Defendants filed pre-motion letters setting forth the grounds on which they would move to dismiss the Complaint, (Dkt. Nos. 38, 39), which Plaintiff opposed, (Dkt. Nos. 40, 41). The Court held a conference on January 31, 2017 and adopted a briefing schedule for the Motion to Dismiss. (See Dkt. (entry for Jan. 31, 2017); Mot. Scheduling Order (Dkt. No. 44).) On February 6, 2017, Plaintiff requested leave to amend the Complaint "for the purpose of augmenting certain of its breach of contract related claims," but not "to amend the 'RICO portion' of the Complaint," and thus asked that the briefing schedule stay the same. (Dkt. No. 43.) The Court granted this request. (Dkt. No. 45.) Plaintiff filed the First Amended Complaint on February 10, 2017, asserting nine causes of action. (First Am. Compl. ("FAC") (Dkt. No. 46).)

On March 10, 2017, Defendants filed a Joint Motion To Dismiss and accompanying papers.  (Dkt. Nos. 47, 48.)  Plaintiff filed an opposition on April 14, 2017, (Dkt. No. 50), and Defendants filed a reply on April 28, 2017, (Dkt. No. 52).  On March 6, 2018, the Court held oral argument on the Motion To Dismiss, and issued a bench ruling granting the Motion in part and denying it in part.  (*See* Dkt. (minute entry for March 6, 2018); Oral Arg. Tr. (Dkt. No. 108).)  The Court issued an order the next day formally dismissing "Plaintiff's RICO, RICO conspiracy, good faith and fair dealing, and breach of contract claims, and the unjust enrichment claim against Boudria."  (*See* Order 1 (Dkt. No. 57).)  The Court also clarified that it dismissed only the unjust enrichment claim against Boudria as duplicative of the fraudulent misrepresentation claim, but did not dismiss the unjust enrichment claims against Burns, GG, or BCN.  (Order 1 n.1.)

Plaintiff filed the operative Second Amended Complaint on May 15, 2018, along with a revised RICO statement.  (SAC; RICO Statement (Dkt. No. 63).)  On May 23, 2018, Defendants advised the Court that Defendant Boudria had passed away, (Dkt. No. 65), and the Estate of Richard M. Boudria was substituted as a defendant, (Dkt. No. 75).

On August 29, 2018, with leave of the Court, Defendants filed a Joint Motion To Dismiss the Second Amended Complaint.  (Not. of Mot.; Defs.' Mem. in Supp. of Mot. ("Defs.' Mem.") (Dkt No. 87).)  Plaintiff filed a response on October 19, 2018, (Dkt. No. 100), and an amended response on October 21, 2018, (Pl.'s Mem. in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 101)).  Defendants filed a reply on November 19, 2018.  (Defs.' Reply in Further Supp. of Mot. ("Defs.' Reply") (Dkt. No. 102).)

## II. Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering the Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B. Analysis

#### 1. Plaintiff's RICO Claims

Previously, the Court dismissed Plaintiff's RICO claims as time-barred. (*See* Oral Arg. Tr. 69–73.) The Court further held that Plaintiff's allegations failed to sufficiently plead an enterprise, failed to allege facts from which it could be inferred that each individual defendant participated in the operation or management of the enterprise itself, and failed to sufficiently allege a pattern of racketeering. (*Id.* at 75–81.) Defendants argue that Plaintiff's RICO claims are still time-barred, and in any event fail to state a claim. (Def.'s Mem. 8.)

Plaintiff's first and third causes of action assert unlawful conduct in violation of 18 U.S.C. § 1962(c), and its second cause of action alleges a conspiracy in violation of 18 U.S.C.

§ 1962(d).  Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"  18 U.S.C. § 1962(c).  To establish a claim for a civil violation of section 1962(c), a plaintiff must show "that a person engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citation and quotation marks omitted).  Section 1962(d) prohibits conspiracy to violate subsections (a), (b), or (c) of § 1962.  *See* 18 U.S.C. § 1962(d).

Defendants argue that despite the inclusion of alleged threats that occurred within the statute of limitations, Plaintiff's RICO claims are still time-barred because the threats were part of a continuing scheme, rather than new and independent injuries.  (Defs.' Mem. 9–11.)  "The statute of limitations for a civil RICO claim is four years."  *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) (citations omitted).  The statute of limitations begins to run "when the plaintiff discovers or should have discovered the RICO injury."  *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998) (citation omitted).  "An injury is 'discoverable' when a plaintiff has constructive notice of facts sufficient to create a duty to investigate further into the matter. . . .  In essence, knowledge of the fraud will be imputed to a plaintiff if there are circumstances sufficient to alert a reasonable person to the probability that he or she has been defrauded."  *World Wrestling Entm't, Inc v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 525 (S.D.N.Y. 2007) (citations and quotation marks omitted), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).  However, the Second Circuit has also recognized a "separate accrual rule," whereby a "new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury."  *Merrill Lynch*, 154 F.3d at 59 (citation omitted).

"Pursuant to this rule, a plaintiff who is continuously injured by an underlying RICO violation may only recover for injuries discovered or discoverable within four years of the time suit is brought." *Nat'l Grp. for Commc'ns and Computs. Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y.2006) (citing *Bingham v. Zolt*, 66 F.3d 553, 560 (2d Cir.1995)).

"It is the RICO injury that triggers the accrual, not the RICO violation." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 158 (S.D.N.Y. 2014) (citation and alteration omitted). But, "allegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained." *World Wrestling Entm't*, 530 F. Supp. 2d at 524 (citation omitted). Plaintiff filed the initial Complaint on December 13, 2016. (*See* Compl.) Therefore, any RICO claims relating to injuries suffered before December 13, 2012 are time-barred.

The Court previously held that the RICO claims accrued on January 5, 2012, when Boudria allegedly made the extortionate threat that resulted in years of payments by Plaintiff. (Oral Arg. Tr. 70.) Plaintiff has added three new allegations of threats made by Boudria. Specifically, Plaintiff alleges that in March 2013, Boudria implied that failure to make the extortionate payments would affect the professional futures of McCrosson's sons who worked for Plaintiff, (SAC ¶¶ 91–97); in August 2013, Boudria allegedly threatened not to renew the G. Marshall Agreement if the Plaintiffs did not continue to make the payments, (*id.* ¶¶ 98–103); and in October 2013, Boudria slightly modified the payments required and demanded that McCrosson continue making them, (*id.* ¶¶ 104–12). Defendants argue that these newly-alleged threats "all relate back to, and reinforce, the initial threat Boudria allegedly made on January 5, 2012," and therefore do not constitute independent injuries. (Defs.' Mem. 10.)

The Court agrees. Courts in the Second Circuit routinely hold that subsequent payments in furtherance of a single scheme are not new and independent injuries. *See, e.g.*, *In re Merill*

*Lynch*, 154 F.3d at 59–60 (holding that "the collection of annual fees" in the life of the partnership scheme, which "was fraudulent at the outset," "cannot be viewed as a separate and distinct fraud creating new injuries as it was simply a part of the alleged scheme"); *World Wrestling Entm't, Inc.*, 530 F. Supp. 2d at 527 (holding that receiving below market royalties did not present new and independent injuries because receipt was "linked to the injuries [the] [p]laintiff alleges it suffered when it granted these licenses" (citation omitted)); *Nat'l Grp. for Commc'ns & Computs. Ltd.*, 420 F. Supp. 2d at 265–66 (finding that the "plaintiff discovered, or could have discovered, the full extent of related, future injuries at the outset of a single, unlawful scheme" because it "understood . . . that it would be making six percent kickback payments on all revenue earned from [the] subcontracts"); *see also 421-A Tenants Ass'n, Inc. v. 125 Court St. LLC*, 760 F. App'x 44, 50 (2d Cir. 2019) ("In this case, the tenants allege that they were injured by the renewal leases because the renewal leases used the illegally-inflated initial rent amount to calculate rent increases. Although each renewal lease therefore leads to a new injury, that injury is not independent of the alleged underlying RICO violation because it is caused in material part by the alleged fraud committed in connection with the first lease."); *Rosenshein v. Meshel*, 688 F. App'x 60, 63 (2d Cir. 2017) (holding that later foreclosures "were merely symptoms of [the plaintiff's] pre-existing injuries," which "occurred when he made the allegedly fraudulent investments"); *Town of Mamakating v. Lamm*, 651 F. App'x 51, 54–55 (2d Cir. 2016) ("All of the alleged injuries . . . are part of the same original injury—the loss of control over local resources and resource management."). The fact that Boudria allegedly made additional threats to continue exactly the same scheme does not restart the clock on the statute of limitations. *See Merrill Lynch*, 154 F.3d at 59–60 (holding that "later communications which put a gloss on the losing [fraudulently induced] investments were continuing efforts to conceal the initial fraud, and

not separate and distinct fraudulent acts resulting in new and independent injuries"); *Lorber v. Winston*, 962 F. Supp. 2d 419, 447–48 (E.D.N.Y. 2013) ("[T]he [p]laintiff alleges one singular scheme . . . which was fraudulent at the outset. In this regard, the [a]mended [c]omplaint asserts that [the defendants] fraudulently gained access to [the plaintiff's] Credit Line in 2004 in order to defraud the Plaintiff. Thus, any advances that were taken from the Credit Line, including those from after 2008, simply followed from the execution of that scheme."); *Schlesinger v. Schlesinger*, No. 05-CV-5016, 2007 WL 9706975, at *7 (E.D.N.Y. Nov. 15, 2007) (holding that because "the [p]laintiff's situation was not altered by" additional wrongs that occurred within the statute of limitations, "there was no new injury"); *Pharr v. Evergreen Gardens, Inc.*, No. 03-CV-5520, 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) ("The injury the plaintiffs allegedly suffered due to the rent bills mailed within the four-year statute of limitations is identical to the injury they suffered when the defendants allegedly unlawfully increased the room count."), *aff'd*, 123 F. App'x 420 (2d Cir. 2005). Indeed, Plaintiff alleges throughout the Second Amended Complaint that the excessive payments were made due to "*continuing* fear of the threats made by Boudria to harm [Plaintiff]'s business and economic interests." (SAC ¶ 186 (emphasis added); *see also id.* ¶¶ 75 (noting that "McCrosson considered Boudria's demands to be a *continuing* threat to [Plaintiff]'s business arrangement with Defendant BCN" (emphasis added)), 101 (describing Boudria's August 2013 demand "to be a *continuing* threat to its profitable business arrangement with Defendant BCN" (emphasis added)), 107 (describing Boudria's October 3, 2013 threat to constitute "a *continuing* threat to [Plaintiff]'s profitable business arrangement with Defendant BCN" (emphasis added)).) The fact that Plaintiff now alleges that Boudria, on a few occasions within the statute of limitations, reminded Plaintiff of the continuing threat to damage their profitable business relationship if he failed to make the ongoing payments does not alter the

Court's initial conclusion that the injuries themselves, i.e., the excessive payments, "[we]re predictable and indeed even scheduled payments that the plaintiff knew about and certainly could have discovered at the outset the first time it made the payment in response to the extortionate threat." (Oral Arg. Tr. 70.) *See Long Island Lighting Co. v. Imo Indus. Inc.*, 6 F.3d 876, 887 (2d Cir. 1993) (holding that upon delivery of defective generators, the plaintiff's "injury was not in any sense speculative . . . , and its RICO claim accrued at that time"); *Waldner v. N. Am. Truck & Trailer, Inc.*, 277 F.R.D. 401, 408 (D.S.D. 2011) ("The statute of limitations clock beg[an] when [the plaintiff] should have discovered the initial injury and d[id] not 'reset' every time [the plaintiff] discover[ed] a new act that is part of the conspiracy." (citing *Rotella v. Wood*, 528 U.S. 549, 558 (2000))).

Plaintiff argues that the newly-alleged threats make its RICO claims "more analogous to those in *Bingham* . . . than in *Merrill Lynch*." (Pl.'s Mem. 5.) However, *Bingham* is distinguishable. In *Bingham*, the Second Circuit held that the separate accrual rule extended the statute of limitations in a case "involv[ing] a continuing *series* of fraudulent actions undertaken to divert and conceal assets and income." 66 F.3d at 561 (emphasis added). However, in *Bingham*, the Second Circuit was "careful to note that the injury had to be new and independent to be actionable," and ultimately found "the new injuries in that case to be caused by a variety of schemes which were related only in their ultimate goal." *Merrill Lynch*, 154 F.3d at 59 (citing *Bingham*, 66 F.3d at 561). Here, Plaintiff has expressly alleged a single continuous scheme in which Boudria threatened to damage BCN's business relationship with Plaintiff if Plaintiff failed to make continuing payments to Boudria at regular intervals. Thus, Plaintiff's RICO claim is in fact more similar to the one the Second Circuit found time-barred in *Merrill Lynch*. *See Merrill Lynch*, 154 F.3d at 60 ("[T]he collection of annual fees occurred in each year of the life of the

partnerships.  Collection in later years cannot be viewed as a separate and distinct fraud creating new injuries as it was simply a part of the alleged scheme.").

*Bankers Trust Company v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), on which Plaintiff also relies, is likewise distinguishable.  There, the Second Circuit emphasized that "[e]ven after injury has occurred . . . and a civil RICO claim has accrued, there will frequently be additional, independent injuries that will result from the same violation of § 1962, but which, because they will not occur until some point in the future, are not yet actionable as injuries to [a] plaintiff's business or property."  859 F.2d at 1103 (citation omitted).  Plaintiff alleges the *inverse* scenario here: the Second Amended Complaint alleges new RICO violations that merely reinforce the *same* injury.  Each payment made in connection with the single scheme may be recoverable as damages, *see Bankers Tr.*, 859 F.2d at 1103 ("[W]here the plaintiff has already suffered injury and will continue to suffer that same injury in the future, an award of past and future damages may be entirely appropriate, subject of course to the normal standards governing such awards."), but the continuing damages do not restart the statute of limitations unless they stem from new and independent injuries, *see Merrill Lynch*, 154 F.3d at 59–60 (noting that injuries must "be new and independent to be actionable"); *see also 421-A Tenants Ass'n,*, 760 F. App'x at 50 (holding that although each annual renewal of an illegal lease "leads to a new injury, that injury is not independent of the alleged underlying RICO violation because it is caused in material part by the alleged fraud committed in connection with the first lease"); *Towne v. Robbins*, No. 02-CV-1688, 2005 WL 139077, at *3 (D. Or. Jan. 20, 2005) ("The continued payment of royalties cannot serve as a new injury under the separate accrual rule because it constitutes merely the same injuries resulting from the same policies continuing into the limitations period." (first citation, alteration, and quotation marks omitted) (relying on *Merrill Lynch*, 154 F.3d at 59–60));

*131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1517–18 (S.D.N.Y. 1995) ("[The] [p]laintiffs clearly incurred expenses in defending their interests [in fraudulent investments] from challenge by the tax authorities prior to February 8, 1989[, the date exactly four years prior to filing suit]. Any expenses incurred after February 8, 1989 would amount only to further damages, not to a new, independent injury."); *but see Ctr. Cadillac, Inc. v. Bank Leumi Tr. Co. of N.Y.*, 808 F. Supp. 213 (S.D.N.Y 1992) ("[The p]laintiffs sustained actionable injury every time they lost money as a result of [the] [d]efendants' RICO scheme. The [c]omplaint alleges that [the] [p]laintiffs have made thirty-six payments to [the] [d]efendants within four years of commencing this lawsuit. [The] [p]laintiffs' RICO claims for these payments are timely." (citation omitted)), *aff'd*, 99 F.3d 401 (2d Cir. 1995).[1]

Other circuits are in accord with the Second Circuit's approach. In *Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996), the Ninth Circuit drew on language defining an "overt act" in analyzing whether an injury restarts the statute of limitations, noting that it suggests the injury must stem from "a new and independent act that is not merely a reaffirmation of a previous act," and "must inflict new and accumulating injury on the plaintiff." *Grimmett*, 75 F.3d at 513 (citation and alterations omitted). The Seventh Circuit has emphasized that "[u]nder a separate accrual rule, a new cause of action accrues only when there is a new instance of wrongful conduct *and* a new injury," and noted that "[d]ifferent injuries flowing from the same conduct are not usually actionable in separate lawsuits." *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 n.10 (7th Cir. 1992), *as amended on reh'g in part* (Oct. 26, 1992) (emphasis in original); *see also*

---

[1] The Court notes that in affirming *Center Cadillac*, the Second Circuit was faced only with the plaintiffs' appeal of the district court's dismissal of certain of the plaintiffs' RICO claims as time-barred; it was thus not faced with the question of whether the district court appropriately determined that claims based on payments made *within* the statute of limitations were timely.

*Pilkington v. United Airlines*, 112 F.3d 1532, 1537 (11th Cir. 1997) ("A mere recharacterization or continuation of damages into a later period will not serve to extend the statute of limitations for a RICO action." (citation omitted)).

Additionally, two Supreme Court decisions counsel in favor of finding Plaintiff's RICO claims time-barred. In *Rotella*, the Supreme Court rejected the application of a rule that provided RICO claims accrued when a plaintiff discovered both their injury and the pattern of racketeering that would support the claim. 528 U.S. at 555–61. The *Rotella* Court emphasized that to adopt such a rule would be "at odds with the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella*, 528 U.S. at 555 (citations omitted). The *Rotella* Court also emphasized that "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock," and that such a rule furthers "[t]he object of civil RICO," which is "not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity . . . an object pursued the sooner the better." *Id.* at 555, 557. Similarly, in *Klehr v. A.O. Smith Corporation*, 521 U.S. 179 (1997), the Supreme Court rejected application of a "last predicate act" rule in the civil RICO context, which would have provided that a claim accrued at "the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity," even if the last predicate act did not "result[] in injury to the plaintiff." 521 U.S. at 186 (citation omitted). As in *Rotella*, the *Klehr* Court placed great emphasis on the fact that the proposed rule would create a limitations period that "can continue indefinitely," and that it "thereby conflicts with a basic objective—repose—that underlies limitations periods." *Id.* at 187 (citations omitted). The *Klehr* Court went on:

Indeed, the rule would permit plaintiffs who know of the defendant's pattern of activity simply to wait, "sleeping on their rights," as the pattern continues and treble damages accumulate, perhaps bringing suit only long after the "memories of witnesses have faded or evidence is lost." We cannot find in civil RICO a compensatory objective that would warrant so significant an extension of the limitations period, and civil RICO's further purpose—encouraging potential private plaintiffs diligently to investigate—suggests the contrary.

*Id.* (citations omitted). In both cases, the Supreme Court indicated that preventing civil plaintiffs from sleeping on their rights, and encouraging timely investigation and litigation, were goals animating the interpretation and application of civil RICO's statute of limitations. Like the scenario envisioned in *Klehr*, to hold here that the statute of limitations period extends indefinitely so long as Plaintiff continues to make the alleged extortionate payments would undermine those goals.

In light of these precedents, the Court finds that Plaintiff has not alleged new and independent injuries that would make their RICO claims timely. Accordingly, Plaintiff's RICO claims are dismissed as time-barred.

### 2. State Law Claims

#### a. Breach of Contract

Plaintiff asserts breach of contract claims for each of the five agreements alleged in the Second Amended Complaint. (SAC ¶¶ 248–359.) Defendants argue that none of the alleged contracts is enforceable under the statute of frauds. (Defs.' Mem. 15–22.) The Statute of Frauds renders unenforceable oral agreements that are impossible, by their own terms, to complete within one year of their creation. *See* N.Y. Gen. Oblig. Law § 5-701(a)(1). This includes "[c]ontracts of indefinite duration." *Andrews v. Sony/ATV Music Publ'g, LLC*, No. 15-CV-7544, 2017 WL 770614, at *6 (S.D.N.Y. Feb. 24, 2017). However, "[t]he critical test . . . is whether by its terms the agreement is not to be performed within a year." *Freedman v. Chem. Constr. Corp.*,

43 N.Y.2d 260, 265 (N.Y. 1977) (citation and quotation marks omitted). "[I]f the obligation of the contract is not, by its very terms, or necessary construction, to endure for a longer period than one year, it is a valid agreement, although it may be capable of an indefinite continuance." *N. Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 175 (N.Y. 1968) (citation omitted). The Statute of Frauds thus bars oral agreements that are of indefinite, rather than undefined, duration.

The Second Amended Complaint alleges that the Master Agent Agreement was terminable at will, (SAC ¶ 28), but does not otherwise indicate a time for performance; the four separate oral contracts allegedly were either understood to continue as long as the Master Agent Agreement remained in place, or were terminable at will, (*id.* ¶¶ 129, 140, 148, 157). Because, as alleged, these agreements do not expressly state that they are not to be performed within a year, they do not fall under the Statute of Frauds. *See Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 106 (2d Cir. 1985) ("[A] contract to continue for longer than a year, that is terminable at the will of the party against whom it is being enforced, is not barred by the statute of frauds because it is capable of being performed within one year." (citation omitted)); *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08-CV-10578, 2010 WL 1257326, at *7 (S.D.N.Y. Mar. 12, 2010) ("Because each party had the option to stop making or accepting referrals at any time without breaching the agreement, the alleged agreement was terminable at will. Such an agreement is not within the Statute of Frauds because, by its very terms, it does not extend [the] [d]efendants' liability indefinitely." (citation omitted)).

Defendants also argue that Plaintiff's contract claims "lack definiteness," as they fail to "defin[e] actual contractual terms to which the parties assented." (Defs. Mem. 22.) "[T]o state validly a breach of contract claim under New York law, 'a plaintiff need only allege (1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages.'" *Fort Prods., Inc v. Men's Med. Clinic, LLC*,

No. 15-CV-376, 2016 WL 797577, at *2 (S.D.N.Y. Feb. 23, 2016) (alteration omitted) (quoting

*Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir.

2004)). "Even under the more relaxed pleading standards of Rule 8, the complaint must still

allege the provisions of the contract upon which the claim is based, and, at a minimum, the terms

of the contract, each element of the alleged breach and the resultant damages." *Sedona Corp. v.

Ladenburg Thalmann & Co.*, No. 03-CV-3120, 2009 WL 1492196, at *9 (S.D.N.Y. May 27,

2009) (citation, alterations, and quotation marks omitted).

      Here, Plaintiff has sufficiently alleged the terms and breaches of the various contracts, as

well as resultant damages, and has alleged its own full performance under the contracts. With

respect to the Master Agent Agreement, Plaintiff identifies numerous provisions, and attaches the

Memorandum memorializing the Agreement as an exhibit to the Second Amended Complaint.

(SAC ¶¶ 22–28; SAC Ex. A ("Memorandum").) Plaintiff alleges that BCN "breached the Master

Agent Agreement by its failure to pay amounts due and owing to [Plaintiff] under the Master

Agent Agreement Formula" for services performed, and identifies its damages as at least

$75,000. (SAC ¶¶ 270–71.) With respect to the OMG Agreement, Plaintiff identifies the

formula pursuant to which it would be compensated for services rendered under the Agreement

(the "OMG Formula"), as well as several other terms of the Agreement, (*id.* ¶¶ 127–35), and

alleges that BCN breached the OMG Agreement when it stopped paying Plaintiff under the

Agreement, commingled funds, and stopped providing Plaintiff with a separate accounting, (*id.*

¶¶ 169, 288), and that Plaintiff was damaged in an amount of at least $160,000, (*id.* ¶ 293). With

respect to the Telecorp. Agreement, Plaintiff identifies several of its terms, including services

provided and a formula for compensation, (*id.* ¶¶ 137, 139), alleges it was breached by failure to

pay amounts owed, (*id.* ¶¶ 169, 308, 310), and alleges monetary damages "in an amount to be

determined at trial," (*id.* ¶ 311). With respect to the G. Marshall Agreement, Plaintiff identifies

the services to be rendered, the formula for determining compensation, and other key terms, (*id.*

¶¶ 147–49), alleges a breach in the form of failure to make payments and improper termination,

(*id.* ¶¶ 169, 326), and alleges damages of at least $60,000, (*id.* ¶ 331). Finally, with respect to

the Barter Account Agreement, Plaintiff specifies the services to be exchanged for services of

similar value and the process of reconciling costs, (*id.* ¶¶ 155–63), alleges that BCN breached the

Agreement by failing to properly reconcile costs and thereby receiving "grossly

disproportionate" value of services, (*id.* ¶ 347), and claims damages of no less than $198,000,

(*id.* ¶ 349). The Second Amended Complaint also specifies the approximate dates of the

formation of the contracts, assent by Boudria and McCrosson as representatives of their

respective companies, and details how the contracts were performed by the parties over the life

of the contracts. (*See generally id.* ¶¶ 127–67.) Plaintiff has therefore adequately described

"how th[e] contract[s] w[ere] formed, the date of formation, the consideration, [and] the

contract[s'] major terms" to survive Defendants' Motion. *See Abu Dhabi Commercial Bank v.*

*Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 184 (S.D.N.Y. 2009); *see also Fort Prods.*,

2016 WL 797577, at *2 (holding the plaintiff stated breach of contract claim where "the

[a]mended [c]omplaint states that [the] [p]laintiff and [the] [d]efendant entered into a contract for

[the] [p]laintiff to perform marketing and advertising services for [the] [d]efendant; [the]

[d]efendant agreed to pay a 'fair and reasonable price' for [the] [p]laintiff's services; [the]

[p]laintiff performed on the contract; [the] [d]efendant failed to pay [the] [p]laintiff; and [the]

[p]laintiff suffered damages in the amount of $800,091.00"); *Oberstein v. SunPower Corp.*, No.

07-CV-1155, 2010 WL 1705868, at *5–6 (E.D.N.Y. Apr. 28, 2010) (denying motion to dismiss breach of contract claim where the amended complaint "contain[ed] several paragraphs that discuss the terms of the [contract]," "alleged adequate performance of the contract by [the plaintiff]," and alleged that the defendant failed to perform and that the plaintiff "suffered 'monetary, growth, reputation, and business disruption damages'" as a result); *Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F. Supp. 950, 955 (S.D.N.Y. 1997) (rejecting the defendants' argument that the plaintiff "fail[ed] to specify the terms of [an] oral contract in the complaint" where the plaintiff "in fact specifically described such terms—[the defendant] would perform eight concerts at various Australian venues, and was in turn promised specific compensation: the greater of $1,200,000 or 85% of net proceeds from ticket sales"). Accordingly, Defendants' Motion To Dismiss the breach of contract claims is denied.

### b. Unjust Enrichment and Quantum Meruit

To state a claim for unjust enrichment, a party must demonstrate "1) [the] defendant was enriched; 2) [the] defendant's enrichment came at [the] plaintiff's expense; and 3) circumstances were such that in equity and good conscience [the] defendant should compensate [the] plaintiff." *Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959, 2015 WL 5730339, at *31 (S.D.N.Y. Sept. 30, 2015) (citation, alterations, and quotation marks omitted); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (same). Similarly, "[i]n order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citation and quotation marks omitted). Unjust

enrichment and quantum meruit claims may be "analyze[d] . . . together as a single quasi contract claim."  *Id.* (citations omitted); *see also Hudson & Broad, Inc. v. J.C. Penney Corp.*, 553 F. App'x 37, 41 (2d Cir. 2014) (same).

Defendants argue that Plaintiff "does not plead how BCN was unjustly enriched or unjustly benefitted at [Plaintiff]'s expense" under the alleged agreements, and "provides no explanation as to how BCN can be liable for retaining funds it earned in exchange for providing services to its customers."  (Defs.' Mem. 26–27.)[2]  With respect to the first argument, the Court has already cited the many allegations in the SAC that support an inference that Plaintiff performed services pursuant to various oral or written agreements, and that Defendants failed to compensate Plaintiff as agreed for its services.  (*See generally supra* Section II.B.2.a.)  With respect to the second argument, Defendants cite no allegation in the Second Amended Complaint that supports its characterization that Plaintiff merely alleges that BCN "retain[ed] funds it earned in exchange for providing services to its customers."  (Defs.' Mem. 26–27.)  Plaintiff clearly alleges that *Plaintiff* provided services to BCN and BCN's customers pursuant to various agreements, and was not fully compensated by BCN for those services as agreed.  (*See, e.g.*, SAC ¶¶ 127, 131 (noting that pursuant to the OMG Agreement, "BCN paid [Plaintiff] on a monthly basis . . . for the customers['] use of the BCN services billed under" the OMG Agreement, which provided that Plaintiff would maintain and oversee customer use of those services), 142 (alleging that during the life of the Telecorp. Agreement, "BCN paid [Plaintiff] the agreed amounts . . . on a monthly basis for [Plaintiff's] services assisting [to] build, maintain, service, manage, and oversee the billing of customer use of BCN services"), 159 ("BCN and its

---

[2] Defendants also argue that Plaintiff's quasi-contract claims fail because they are an improper "end-run" around the statute of frauds; however, the Court has already rejected Defendants' argument that the contracts are subject to the statute of frauds.

customers received the services that [Plaintiff] provided pursuant to the Barter Account Agreements, and BCN's customers paid BCN for use of the services.")).  In light of the fact that Plaintiff sufficiently pled its breach of contract claims, and Defendants challenge the existence of those contracts, Plaintiff has properly pled unjust enrichment and quantum meruit as alternative theories of recovery.  *See Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) (collecting cases for the proposition that "[w]here there is a bona fide dispute as to whether a relevant contract exists or covers the disputed issue . . . courts have permitted plaintiffs to pursue both unjust enrichment and breach of contract claims"); *GlaxoSmithKline LLC v. Beede*, No. 13-CV-1, 2014 WL 896724, at *7 (N.D.N.Y. Mar. 6, 2014) ("[B]ecause where, as here, there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quantum meruit as well as contract, and will not be required to elect his or her remedies." (citation and quotation marks omitted)); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) ("When there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment, and an unjust enrichment claim may be alleged alongside a breach of contract claim." (citation omitted)); *cf. First Serv. Fin. Inc. v. City Lights at Queens Landing, Inc.*, No. 08-CV-3312, 2009 WL 750190, at *4 (S.D.N.Y. Mar. 20, 2009) (denying motion to dismiss "unjust enrichment / quantum meruit claim" after holding written contract did not cover the subject matter of claims where the plaintiff "claims that it has 'performed services to the defendant in good faith'" for which it was not compensated).

Defendants also argue that Plaintiff's unjust enrichment claim based on the improper commission and cash payments is time-barred.  "The N.Y. C.P.L.R. does not specify a limitations period for unjust enrichment but the New York courts have held that such claims are

governed by either a three-year statute of limitations when monetary relief is sought or a six-year statute of limitations when equitable relief is sought." *Grynberg v. Eni S.p.A.*, No. 06-CV-6495, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007). However, the Second Circuit, as well as district and New York courts, have applied a six-year statute of limitations even in cases involving monetary relief. *See, e.g.*, *Cohen*, 711 F.3d at 364 (holding in case involving monetary damages that "[u]nder New York law, the six-year limitations period for unjust enrichment accrues upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered" (citation and quotation marks omitted)); *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 513 (S.D.N.Y. 2013) ("The limitations period for unjust enrichment claims is six years, and it starts running when the defendant commits the wrongful act that enriches him." (citation omitted)); *Knobel v. Shaw*, 936 N.Y.S.2d 2, 2 (App. Div. 2011) ("[T]he part of the claim that is based on the individual defendants' keeping all the profits from the properties for themselves is viable for the six years preceding the commencement of this action."); *Elliott v. Qwest Commc'ns Corp.*, 808 N.Y.S.2d 443, (App. Div. 2006) (applying six-year statute of limitations to claim seeking money damages). An unjust enrichment claim accrues "upon the occurrence of the wrongful act giving rise to a duty of restitution." *Cohen*, 711 F.3d at 364.

Defendants cite no caselaw in support of their assertion that the payments within the six- or even three-year statute of limitations are not timely simply because the improper commission and cash payments began in January 2012. (Defs.' Mem. 27.) In any event, in light of the fact that many courts, including the Second Circuit, have applied a six-year statute of limitations to monetary unjust enrichment claims, and that this limitations period would bring all Plaintiff's

claims within the statute of limitations, the Court declines to dismiss the unjust enrichment claims as time-barred at this early stage.

Finally, Defendants argue that Plaintiff's unjust enrichment claims against Boudria and Burns based on the excessive payments fail because there are no allegations that they were enriched by the payments. (Defs.' Mem. 27–28.) It is true that Plaintiff alleges a scheme in which excessive payments were made from Plaintiff to GG at the direction of Boudria on behalf of BCN. However, Plaintiff also alleges that Burns "retained the excessive amounts of the payments Plaintiff made," and that she "allowed Boudria access to and use for his own purposes of those portions of the payments . . . which were in excess of the payments to which GG was entitled . . . ." (SAC ¶¶ 83, 85.) Plaintiff also alleges numerous cash payments made directly to Boudria, which were separate from the wire payments made directly to GG's account. (*See* SAC ¶ 73.) Plaintiff has therefore alleged that Burns and Boudria were personally enriched by the scheme. Accordingly, Defendants' Motion To Dismiss Plaintiff's quasi-contract claims is denied. *Compare Space, Inc. v. Simowitz*, No. 08-CV-2854, 2008 WL 2676359, at *5 (S.D.N.Y. July 8, 2008) (denying motion to dismiss unjust enrichment claim where the plaintiff sufficiently alleged "that [the defendant] has been personally enriched"), *with Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05-CV-8988, 2007 WL 1732427, at *4 (S.D.N.Y. June 14, 2007) (dismissing unjust enrichment claim where the plaintiffs did "not contend that [the] defendants were personally enriched").

### III. Conclusion

For the reasons stated herein, Defendants' Motion to Dismiss is granted in part and denied in part. The Court dismisses Plaintiff's RICO claims with prejudice as time-barred, but denies the Motion with respect to Plaintiff's state law claims. The Clerk of Court is respectfully

requested to terminate the pending Motion. (Dkt. No. 86.) The Court will hold a conference on

November 7, 2019 at 2:30 p.m.

SO ORDERED.

DATED:    September 23, 2019
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE